My name is Paula Harms, and I represent the petitioner in this matter, Mr. Murdaugh. I would like to begin by discussing Claim 3, and specifically the aspect of that claim that deals with counsel's performance in regard to his client's competency in the penalty phase. If counsel had done his job, there is a reasonable probability that this judge would have ordered a competency evaluation, and there is a reasonable probability that Murdaugh would have been found incompetent to proceed in the penalty phase. Well, this is one of the questions I have about Claim 3. Let's assume we all agree counsel was deficient, but your burden is to prove that there was, under Strickland and under AEDPA, that there was a reasonable probability, or more so a likelihood, that the trial court would have found him incompetent to waive mitigation. Looking at the record, can you say there's a likelihood that that would have happened? Well, you get to the heart of the matter, Your Honor. And one thing I wanted to address, which I felt I didn't lay out in the brief possibly well enough, is the timing of Murdaugh's decision about Dr. Deming's report. And I think the key piece of evidence here that shows he was incompetent prior to the penalty phase is in that report. Well, I think Judge Nelson was saying assume that he was ineffective, his performance was ineffective. Why do you think that you would prevail on the question of the prejudice that would result from that, that the judge would not only find him incompetent, but that he would then ultimately prevail? Right. Is that correct? Yes. If you look at the record and the timing of events, what Dr. Deming's report says, I sat down with Mr. Murdaugh and I was trying to explain confidentiality of this report, that it might be released to the public. And on ER 359, at the very beginning of this report, he noted Murdaugh reserved the right to veto the release of this information about his fears about the government and his knowledge of the Temple murders. He reserved the right to veto the release of that information because of fears about his safety and the safety of his family. Before you get there, though, counsel, following up on what my colleagues have asked, pardon my voice, by the way, there were four previous evaluations, each of which found he was competent to plead guilty. Now, that's a different issue. I understand that. But when you look at the prejudice, don't we have to take into account the fact that the judge had heard this before? I mean, this has repeatedly came up. Everybody was aware of his meth use. They were aware of his psychiatric issues. They were aware of all kinds of things. This is not new. There's nothing new there. And yet you're saying that based on Dr. Deming, whose views were quite different than those of the other experts, that that changed the balance. Why is that? The key question was never asked about competency in the penalty phase, and that was what was driving this decision to stop all mitigation. And the answer was clearly in Dr. Deming's report. His delusional beliefs were driving this decision. Now, after the guilty plea and ‑‑ Forgive me, counsel. I thought that the device hidden in his head and so on came up in the trial, in the guilt phase, didn't it? It did, but what changed is Mr. Murdaugh changed his mind after the guilty plea and decided that he wanted mitigation to present it. I understand that, but if I understood you correctly, you were suggesting this was some kind of a new thing, this idea that the paranoid concept, and I was just saying, I don't think that's new. It may have been brought up for the first time in the penalty phase, but the concept is not new, is it? Right. Everyone recognized that he had these delusional beliefs. What was missing from the prior reports is the knowledge about how this was affecting the defense and the representation of Murdaugh, how his paranoia was affecting how much trust he had in them, that he did not believe they were investigating the case because they did not want to reveal this information. So there was a lot of things that were kept from the competency phase evaluators, and I think what is important to recognize is when they were able to testify at the post-conviction, they said that their competency evaluations, they did not feel comfortable with these prior evaluations being used to determine his competency in the penalty phase because of the fact that those delusional beliefs, they may have been subscribed at a certain time, but they could change. And who said this again, please? Dr. Shelley and Dr. Potts, who were the competency evaluators who testified at post-conviction. But there was nothing in Dr. Deming's report that showed that the drugs or personal beliefs caused him to commit the crime, is there? Actually, there's quite a bit of information in Dr. Deming's report that links the crime and the delusional beliefs. He said specifically that... I'm not quite sure where we are in this. As to the, as to why he wouldn't waive or why he did waive or prohibit the mitigating evidence, there is, and I thought Judge Nelson was saying assume that you could show that the counsel didn't do an effective job in allowing him, or in failing to present the case to the judge on why the waiver was a product of his paranoia. And then you were answering the next question, I thought, was, I'm not sure I understand, but I think your next question was, how does that establish prejudice? Well, how does it show the likelihood that the trial court would have found him incompetent to waive mitigation? I mean, assuming that counsel was efficient, then you have to answer, actually, I think, two questions. One, whether there was a likelihood the trial court would have found him incompetent to waive mitigation, and then, but for counsel's error, there is a reasonable probability that the trial court would have sentenced Murdaugh to life. And I, you mentioned Dr. Deming's report, and I said, what in Dr. Deming's report shows that the drug or paranoia beliefs caused him to kidnap and kill the victim? He talks about that at great length in his report. Basically, he invited the victim over. His initial purpose was to teach him a lesson. Then Mr. Murdaugh's paranoia sets in. He notices he has driver's license from two different states. Other things that cause him to believe that maybe he was sent there to get close to him as a government operative. So Dr. Deming specifically links the crime to Murdaugh's delusions, and he acknowledges that the methamphetamine may have exaggerated Murdaugh's preexisting paranoia, but the two were directly linked in Dr. Deming's report. How are we supposed to evaluate these various professional opinions? And I realize some are in the guilt phase, some are in the penalty phase, but they're all part of the record. And we're supposed to evaluate what the judge would have done. How are we supposed to meld these? Are you suggesting that we not consider the four previous evaluations and concentrate only on those that were done during the penalty phase? I think that's the key time period because the decision was so clearly related to the release of Dr. Deming's report. So you are suggesting that we isolate the earlier ones? Yes, I think so, because if you take those evaluators at their word, they do not even feel comfortable with their own evaluations being used to justify. All four of them? All four of the evaluations? Dr. Sindelar didn't testify. One of them did not testify post-conviction, so the record is completely silent as to him. But Dr. Shalley and Dr. Potts both had problems with the staleness of their evaluations and the fact that they didn't address the specific decision that was to be made. And I kind of want to get back to the timing of everything, because I think the timing, I didn't lay it out properly in the brief. So Deming's report says Murdoch is fearful about this report being released because it outlines in great detail his delusional beliefs about the government. Okay, on August 14th, a status conference is held regarding mitigation, and counsel is ordered to produce the X reports in a couple of weeks. But on that date, he goes ahead and releases Dr. Deming's draft report to the prosecutor. Counsel admitted in post-conviction that at this stage of the game, Murdoch was still on board with presenting mitigation. On that very same day that he released Dr. Deming's report, despite Murdoch's fears, he gets an e-mail. We're losing some of your... Apologize. He gets an e-mail on that very same date in which the mitigation specialist tells him, you and I, both of us together, or you alone, you need to go down and talk with Mr. Murdoch about Dr. Deming's report because he wants to review it and he is going to be upset by it because it refers to his firmly held beliefs as delusions, that these things he holds to be so true, in fact, make him mentally ill. Does counsel do this? No. He hasn't seen his client in a year and eight months. Two weeks later, when it's time to give up the reports, he faxes the prosecutor a letter or sends him a letter stating that Murdoch does not want any more expert reports to be released. The very next day, he visits his client for the first time in a year and eight months, but by then it is too late. Well, he had called his client a couple of times a week during that period, had he not? We don't know if they actually spoke. The testimony, I believe, was that he would call the office sometimes. Counsel would be there. Sometimes he would not. But when your client's delusions center around phones being tapped by the government and you have a client writing you letters begging you to come and see me in the jail and you do not, you have a duty, especially when the consequences of this decision were so great, you have a duty to ferret out what is this desire coming from. All right, but all of this may go to show that counsel was deficient. What do you have that would show that there is a likelihood the trial court would have found him incompetent to waive mitigation? The only person who conducted an evaluation of Murdaugh's competency at the time of the penalty phase was Dr. Deming. He did a report in 2005, and also I just go back to that statement in the report that Murdaugh did not want this information to be released because he feared for he and his family's safety, and it was based upon his delusional belief that if this information got out, he was in harm's way. So I would go back to that original report, and the timing of everything that happens falls in line with that statement. What happens is then that report is released in spite of those fears, and Murdaugh just shuts everything down at that point. So his delusions were driving these decisions. All the other statements in the record about fears for his safety and wanting to spare the pain of the victim's family and his own family, those were present at the time of guilt phase, but after that he decided he wanted mitigation, and there was a year and eight months of proceedings after he pled guilty. So we know he was cooperating in mitigation at some point. All right. We have Dr. Lane's testimony. We have Dr. Deming's. Let's assume arguments on both sides are an equipoise, to use my colleague's point. Which is a theoretical possibility in Justice Breyer's mind. I can't recall a case in 30 years in which anything was an absolute equipoise. Let's assume. And you can answer that hypothetical question. I wish I could. The only equipoise I've ever seen is in an aquarium. Assuming they are an equipoise, although it may be impossible, your client still must show the likelihood that he would have been found incompetent. Isn't that true? Yes, I agree with that, Your Honor. All right. Thank you. Do you want to get on to your other issues? Because you've used half the time in what you call issue three. I was just noticing that, Your Honor, and I was going to move on to the Tenard claim, if that suits the Court. If you don't mind, just so we don't run out of time, count one is the one that, to me, warrants the most attention. I concur. I'd be grateful if you could address those issues. Sure. I think it's important to note that the Arizona Supreme Court recognized that Almendez-Torres has no application in terms of Arizona's statute. They ruled that the new statute gave Mr. Murnau not just a right to a jury on one aggravating fact, but on all the mitigating factors and the ultimate death penalty determination. So I don't think it's for this Court to second-guess the state court's construction of its own statute in that regard. In fact, Walton v. Arizona remained the law of the land for over a decade because the U.S. Supreme Court misconstrued how Arizona's statute operated in the capital context. I think there was a substantial and injurious effect upon the death sentence because the trial court noted that this paranoia was genuine. She believed that Murnau did have some kind of mental problem that affected him at the time of the crime. She found he was intoxicated on methamphetamine to some extent at the time of the crime. Justice Birch, in her dissent, called my client a mental mess. Let's assume the Arizona Supreme Court unreasonably applied harmless error review in considering, and moving on here because of time, the ring error. How could Murnau establish prejudice under Brecht? Yes, I think it's because his mitigation that the trial court considered and found to be mitigating goes directly to his mental state at the time of the crime. And the U.S. Supreme Court has over and over again said mental state evidence is the very kind of evidence that can inspire a life sentence. And that's precisely what Murnau presented and what he had in the record. I think Justice Birch's dissent, she's a reasonable juror. She thought he was a mental mess. She said, I cannot know whether the jurors would weigh as lightly as the trial judge his impairment from drug use at the time of the crime. In fact, Dr. Potts said in his competency report, I believe his methamphetamine use greatly affected him at the time of the crime. His noted diminished mental abilities, his cooperation, his remorse, and his desire to spare his family and the victim's family. Can I switch you to a little different area? Assuming for a moment that we're analyzing this based on Brecht, the Arizona Supreme Court, when it looked at the aggravating factors, focused a lot on the mutilation of the victim. And as I looked at that, it was a question that it was, the language is that he was needlessly mutilated. Now, from my perspective, and I'm sure that of my colleagues, there's never any need to mutilate a victim, and he did that in this case. On the other hand, it appears from the evidence that he mutilated the body in order to deprive officials of being able to identify it. So from his perspective, horrendous though it was, it wasn't needless. Is that a crazy analysis? No, it's right on, Your Honor. Especially the police report noted that when Murdaugh talked about that issue, he became visibly upset. Dr. Deming noted that it was as much to cover up from regular law enforcement as these covert operatives that his delusional beliefs were based on. So as Justice Brecht noted in her dissent, dismemberment, as ugly as it is, it's usually a sign of debasement or perversion, whereas here it was for cover-up. He did the same thing in the Eggert murder, too, right? Yes. So in a way that kind of hurts him, because as I understand Arizona law, if there is evidence that a person, in this case your client, took action to evade capture or guilt, that tends to undercut their defenses that they had a diminished capacity or they were insane or something. I think that argument in the normal case might have more weight, but in this case when you have the client's mental illness is directly related to paranoia. All that aggravating evidence takes on a different color, and you begin to understand that Mr. Murdaugh's paranoia seeps into every aspect of his life, including the fact of the cover-up of the crime. Do you have any case law that would suggest that as well? I would just go back to the general concept that mental illness reduces culpability. Because he's unable to entertain the appropriate mens rea? Well, I think the case law is clear. It doesn't have to go so far as to absolve him of guilt for the underlying crime. It's a matter of reducing moral culpability. If someone is mentally ill, they are not the worst of the worst in terms of receiving the death penalty. So it only applies to the sentencing. Yes, I would agree with that. And I also think it's important to note that the Arizona Supreme Court, in conducting their harmless error analysis, they also had a duty to do independent review. And in reviewing Murdaugh's death sentence, they struck the relishing finding of the trial court, which is a pretty weighting, aggravating factor that they did not find there's evidence that he enjoyed the murder somehow. So I think taking that out of the equation makes it even more likely that there was abrupt error. Can I switch you one more time? The Supreme Court of Arizona discussed whether the Ring case decided by the Supreme Court permitted them to come up with harmless error or whether it was a structural requirement. I obviously know what your preference is, but will you tell me why this is a structural issue as opposed to a harmless error issue from your perspective? Right. Arizona v. Fulminante defines structural error as a defect which affects the very framework of the trial. And if you look at Sullivan v. Louisiana, it talks about harmless error review can occur only if the jury can hypothesize a guilty verdict that was never in fact returned. Well, here you are hypothesizing a sentencing verdict that was never returned. So I don't think there could be anything more... Because there was no jury. What's that? Because there was no jury. Right. I don't think there's anything more essential to the framework of a trial than 12 jurors sitting in the box. Well, actually, all you need is one juror to have a different verdict. Correct. So if you had one reasonable juror, as we like to say about one reasonable judge, if you could find one reasonable juror, you would prevail in that case. Right. And here we have the perfect example in Justice Birch acting as the reasonable juror, saying she believed it's possible that he could have received a life sentence. And if you look at all those other ring remand cases where they did harmless error analysis, nine of those defendants remanded despite the fact that there was a prior conviction aggravating factor. Five of them were remanded even though there was no error in any of the aggravating factors. And if you look at my analysis in the brief, so many of them did not have any mental health evidence presented at all, yet the Arizona Supreme Court said, we do not feel comfortable. Let's send this back. So doesn't that argue... We don't feel comfortable in this case. You could make that argument both ways. They were very reasonable, moderate, and almost everybody else, but they felt this case was different. Their analysis doesn't hold water, though, in terms of treating the mitigation equally. Mr. Murdaugh had a lot more mitigation than many of these defendants, I would say, especially since it was noted by everyone. Everyone who evaluated him noted these delusions. But following up on Judge Reinhart's question, doesn't that really hurt your client in the sense that they looked at all these cases and they sent most of them back, but there must have been, and this goes to what you need to show, that there's a reasonable probability that the trial court would change its mind here. Well, I think you have to recognize under the AEDPA that, you know, they had this artificial test upon the mitigation about causal nexus, and I don't think the use of the term weight detracts from what they did here. They're saying you can never give effect to this mitigation unless you connect it to the crime, and that is clearly prohibited by the Eighth Amendment. I would like to save the remainder of my time for rebuttal. Thank you. May it please the Court. My name is Jeff Zick, and I represent the appellee in this matter. To your question, Judge Reinhart, on Equipose, I can't think of a case where there was actual Equipose. I think Kansas v. Marsh discussed it in a hypothetical sense, so I can't think of a case where there is actual Equipose. Well, good. I'd like to use you as an expert witness for my complaint about that test. That might not... Well, okay. Would you please speak directly to the mic? We have law clerks listening to this argument, and unless it all comes through, they won't be able to understand your argument. Okay. Well, is that good? That's wonderful. Great. With respect to the harmless error review, when you look at Claim 1, and we're talking about ring error, what the Arizona Supreme Court did was actually go further than what ring required by taking a harmless error review of the actual mitigation. So it actually looked at harmless error with respect to sentencing. What ring required was... What the evidence was when they said there was nothing, no causal connection? No, I don't believe they made a mistake in that sense. When they said there's no evidence of causal connection. No. Wasn't Dr. Potts' statement that they did not refer to, didn't that say there was a causal connection? Dr. Potts' report, I believe it was his... I can't remember if it was his first or second report, did indicate that there was some... that his delusions had some effect or his methamphetamine use had some effect on what had occurred. Well, that's known as a causal connection, isn't it? That's correct. Well, it can be known as a causal connection, and for the purposes of this argument, we can say is it a causal connection. But what the Arizona Supreme Court did in its harmless error review is looked at the statutory mitigating factor, and it's the G1, a substantial impairment, and said that there really was no connection. I don't think that's a factual error because when they looked at the evidence as a whole, which this wasn't evidence that Murdaugh was precluded from presenting, he did present it to the trial court, or actually he waived mitigation and the trial court found the mitigation in the record. But it said that because there's no connection and typically experts would testify to this, that it didn't meet the standard by preponderance of the evidence for the statutory, but what it said later in the opinion is that it would be considered as non-statutory mitigating evidence. So it was considered twice with respect to the sentence. But at one point they said there was no evidence, and it's not unknown to modern society that judges and courts say inconsistent things in different parts of their analysis. I'm shocked. I am shocked. Well, it's news to Judge Smith, but he's only had about 20 years by now. But, you know, courts do make inconsistent statements, and it's pretty clear that when they analyze the statutory mitigating factor, they said that there was no evidence of a causal connection, and there was, and they seem to be influenced by that, although that's not a basis for denying mitigation. Why wasn't this objectively unreasonable? Well, it wasn't objectively unreasonable to use that weight factor in looking at this evidence, and I don't think, I'm trying to look at the opinion to see where they said there was no evidence. What the court did say was that a defendant's claim of alcohol or drug impairment fails when there's evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm his ability to control his physical behavior. So they analyzed the evidence, even Dr. Potts in his report, with respect to any connection between his drug ingestion and mitigating evidence. So they did consider it and used a weighing factor in considering that evidence, which isn't a violation of the Eighth Amendment. But there was evidence. There was, well, Dr. Potts' sole sentence saying that in his belief, in his competency evaluation, that the methamphetamine ingestion could have had some role here, yes. But when they looked at the evidence as a whole and looked at his behavior after or at the time of the crime, it clearly showed, at least in the Arizona Supreme Court's mind, that that evidence hardly had any weight, if any at all.  But, again, they considered the evidence as non-mitigation as well later on in the opinion, and they said no rational jury would have weighed these factors. Okay? So they're talking about weight. They're not talking about a test used to preclude mitigation from being given its due effect. That's why we believe that there was no Eighth Amendment violation in the use of or the language of causal connection with respect to the mitigation evidence. But, again, going back to the original claim, there was no ring error here, because ring never demanded the state courts to look at a sentence under harmless error. It was the aggravating factors, the eligibility factors for a capital sentence that needed to be looked at under ring. With respect to Claim 3, unless the Court has any further questions on that claim... Could you address the issue of structural error? Why do you think that the harmless error really works here? Because, well, one, the Supreme Court has never held that ring error is structural. Again, ring error goes to the eligibility factors, and what ring was really premised on was Apprendi, and Apprendi clearly has been reviewed under harmless error. So there is no structural error in this sense, and the Arizona Supreme Court's reliance on NEDER was reasonable for a clearly established law in this area. I want to ask you about the case of State v. Pandeli, which appears to me to be the most analogous case, and they found the F2 and F6 aggravating factors were met, but nevertheless they remanded for resentencing after finding a reasonable jury could have found G1 mitigating. How do you distinguish that case from this case? Well, Pandeli dealt with a lot of different factors than the Murdaugh case did. With respect to the G1 aggravating factor, I don't recall exactly what the mitigating factors or the mitigation evidence in Pandeli was with respect to that particular factor, but here we had methamphetamine ingestion used as a G1 mitigating factor. And what the court did, and what I read to you earlier, is rely on state law that talked about a defendant's behavior at the time of crime really would show whether that mitigating factor would be found. And the Arizona Supreme Court in this case clearly said that no rational jury would find that mitigating factor beyond a reasonable doubt because of Murdaugh's actions at the time of the crime and after the crime in trying to hide evidence. So I think it's a lot different from Pandeli when you look at what the Arizona Supreme Court actually said here with respect to that mitigating factor. Thank you. With respect to Claim 3, the competency in the penalty phase, the record is quite clear that there's really no likelihood, reasonable likelihood, that Murdaugh would have been found competent. But the real question is, at the time of his waiver, there is no clearly established federal law requiring state courts to go through any particular or specific procedure to determine waiver of mitigation. If you look at the Landrigan case, the Supreme Court said that they have never required a knowing and intelligent waiver with respect to waiving evidence. And in Landrigan, he was waiving his mitigation presentation. Help me with this issue. With respect to the G-1, the Arizona Supreme Court said, and I'm quoting, because of the complete lack of evidence of a causal connection between Murdaugh's drug use and the murder, and then skipping a little bit, no rational jury would have found that Murdaugh established the G-1 mitigating circumstance. If I recall correctly, that was the very thing that Dr. Deming was trying to establish, which somehow didn't get considered. What am I missing? I'm not sure, was it Deming's first report or the second report? Because at the time... Either one. There was a lack of connection between his drug use and the murder when you look at the complete evidence that was found by the trial court in mitigation. Even though Dr. Potts, in one sentence in his report, indicated that his drug ingestion may have had something to do with what happened here, when they looked at the history of the facts of what happened, and the Arizona Supreme Court did, it looked at his industry of thought at the time of the murder and after the murder. It looked at his ability to rationally think. So when they looked at the lack of evidence, they were looking at the broad sense of every piece of evidence that was presented in this case, and said there was a lack of evidence to make the G-1. But that didn't end the inquiry for the Arizona Supreme Court. I guess what I'm struggling with here is there's some evidence. It may not be entitled to a lot of weight, but there is some evidence, based upon these two doctors' views. How do we reconcile what the Supreme Court said with the fact that there is at least some evidence entitled to whatever weight? Well, I think what you can do is take the Arizona Supreme Court's language of complete lack of evidence, even though there may have been a sentence in Dr. Potts's report. There was a little more than a sentence in Dr. Potts. He talked about the fringe beliefs of Murdaugh, did he not? He did, but he didn't connect those fringe beliefs to what actually happened in the murder. If you remember, Dr. Potts reviewed or evaluated Mr. Murdaugh for competency, and he in fact indicated that his delusions, the fringe beliefs that he held, didn't affect his ability to understand what was happening in the proceedings or rationally. Right, he could stand trial, but if you go to mitigating circumstances and waiving them, that goes beyond the ability to understand your lawyer and talk to your lawyer and make decisions. If he really is, I don't want to use the word crazy, but if he really believes these things, that could affect him, could it not? Well, I think the Arizona Supreme Court and the trial court looked at that and came to the conclusion that even though he had these fringe beliefs and these delusions, they had nothing to do with the crime. If you look at Dr. Lange's report... But what about waiving mitigation? It would be the same. Well, with respect to waiving mitigation, he was found competent to plead guilty. You know, there's a totally different problem between whether you committed a crime because you're crazy, to use Judge Nelson's word, but because you're paranoid. And is a man who wrote a letter or made a motion to be transferred out of state because he was so afraid of going to prison in Arizona. I don't know why anyone would fear Arizona more than California. Maybe because he's paranoid. But that was a motivating factor in waiving his mitigation. He said he only wanted to go on death row, not in the general population, unless he could be in a different state. And when that was denied, he then waived mitigation. I mean, that shows a much different problem than whether you're crazy when you kill somebody. Or maybe he realized we don't execute people in California, but they do in Arizona. He said he would be executed rather than go into an Arizona general population. That establishes some relationship between his mental problems and his waiver of mitigation, doesn't it? Well, I don't think in this case it does, because Murdaugh had various reasons for waiving mitigation and pleading guilty. When you look at the record and the correspondence that Murdaugh had between his counsel, or with his counsel, he indicated that he wanted to plead guilty and waive mitigation because he wanted to end this, didn't want the victims to go through a trial, didn't want his own family to go through trial. And there's letters indicating that he just wanted to let his sons get on with their lives. So there are various reasons that wouldn't appear to be paranoid. And some that do appear to be paranoid. Well, I'm not sure that they actually do appear to be paranoid. I mean, an individual that doesn't want to go to general population, I don't know if that's... No, that might not be if he was willing to do it in another state and wanted to do it in another state. Right. But the problem, the trial court had three separate reports on his competence prior to the waiver of mitigation. Dr. Lange evaluated Murdaugh four days prior to his waiver. And although she didn't necessarily look at his competence, she was well-versed in the law of competency, at least as far as forensic psychology goes. Did this just happen to be in the courtroom? Is that when the judge said, what do you think? No, what happened was prior to his actual waiver on September 28, 2001, there was a status conference on September 8, 2001. At that status conference, there was discussion about the trial court wanted mitigating evidence. The state said, well, if you order me, I will present whatever I have. But also made clear in that transcript that he was going to call Dr. Lange to rebut any mitigation that would be presented. So that's why Dr. Lange was at the September 28 hearing. And that's when the state offered Dr. Lange as far as whether Murdaugh is competent. Now, she evaluated him for 13 to 15 hours just days before this event and indicated that his cognitive abilities were just fine and he had the ability to rationally think. So she didn't find any indication that he was not competent. This was when the state was supposed to provide mitigating evidence? Yes. And this is what you call mitigating evidence? No. What the state did at that hearing is try to provide Dr. Deming's report and Dr. Shaw's report. But when it did so, Murdaugh objected. He objected to the parts that he said were private. Well, the Rule 11 evaluations, which the court had, were already out there, and Murdaugh indicated that he wasn't going to object to that. But he was going to object to any other mitigation evidence that was disclosed from the defense to the state. Now, the state didn't have any further mitigation evidence. But Dr. Lange did not evaluate him for competence to waive mitigation. Is that correct? That's correct. She didn't. And she conceded that when she got up and testified. However, she did testify that she has done Rule 11 evaluations for competency. She was on the list to do them as an expert in the superior court. And she didn't notice anything in her hours of evaluating Murdaugh that would indicate to her, in her professional opinion, that he was not competent. So based on that and based on the fact that the trial court had many dealings with Mr. Murdaugh throughout the proceedings, she indicated that he was competent to waive. She had a colloquy with him. He said, I'm freely giving up this right. There's nothing in the colloquy that indicates that his paranoid delusions were somehow manifesting over his knowing and intelligent voluntary waiver. Well, you can see that there's a difference between competency to stand trial, competency to waive mitigation evidence. I don't believe there is, Judge. Because? Because the Supreme Court has never decided whether there has to be any particular finding by the trial court on waiving evidence. And if you look to Landrigan, it specifically said that they have never required a waiver of evidence to be knowing and intelligent. And what Landrigan did in his... Including competence as well as knowing and intelligent. I believe it would be included in that. But for a waiver of mitigation in Landrigan's case, he simply waived the mitigation and said, I understand the consequences and I want you, trial court, to give me death. And the Supreme Court said that was a valid waiver of presenting that evidence. So in this case, it's the same thing. You had a trial court. And I disagree with when Judge Smith asked my colleague about narrowing and not considering everything. I think the trial court had a broad history of dealing with Mr. Murdaugh and all of his reports from the Rule 11 evaluations that she should take into consideration at the time he waived mitigation. And that certainly weighed heavily in her decision. And from the state's perspective, then your colleague is incorrect in trying to isolate the time period of when you evaluate Mr. Murdaugh. In other words, the trial court could consider the dealings with Mr. Murdaugh throughout the guilt phase as well as the penalty phase. That only makes sense in determining... I'm not quarreling with that. I'm just contrasting your view with hers. Yes, that is the state's view here. If the court has no further questions, I'd... Well, I'll just ask one to follow up for Judge Smith when he asked you about the structural error. The question, I assume, would be, since there isn't a Supreme Court decision as to whether this is or is not structural error, the question then would be whether it's an unreasonable determination of whatever it is that the prior Supreme Court case on what's structural error, whether it's an unreasonable determination to say that this is not structural error. But specifically, if we have a prior Ninth Circuit case that says it is structural error and that decision was vacated on another ground, which means I think it still remains the law of the circuit, which may or may not bind us because of intervening events or whatever. What's your view of whether we are bound by prior Ninth Circuit decision as to whether this is or isn't structural error? Well, I think I understand this hypothetical. I will go first with... You're not an equipoise. I think first of what I would say is that it wasn't an unreasonable application of Apprendi and Ring in finding that this wasn't structural error. But getting to your hypothetical, if... Well, it's not really a hypothetical. Well, if there is a Ninth Circuit opinion that says this is structural and the Supreme Court has never said that, although I believe in Ring they essentially said that or said that it was harmless error instead of structural error in footnote 7. But if there is a Ninth Circuit case that says it's structural, I believe that would be contrary to what Supreme Court law says. But if you find that it isn't and it was vacated on other grounds and then you have that, then perhaps you would be bound by that, although it would create, if it hasn't already, a circuit split because most... Well, that's not a problem. That I know. But your first point and your major point would be that the Supreme Court has decided that question. I don't believe it has. It effectively has. If you look at footnote 7 in Ring, it indicates that this would be a harmless error review. And if you look at Ring itself, which relies on Apprendi, Apprendi clearly is harmless error. It's not structural error. And that's what Ring was premised on for the most part. So I can't imagine that this isn't harmless error. So the state believes that this is harmless error, obviously, from our briefs, and the district court so found, and the Arizona Supreme Court has found on numerous occasions. Footnote 7 says we do not reach the state's assertion that any error was harmless. Is that the one you're... Yes. I believe that's the one. But if you can also look at Summerlin, the Summerlin case, which also indicates that this would not be structural error. It didn't find that this was a substantial or this was a procedural change, not a substantive change. All right. Well, you said you were through and I detained you, but... That's okay. If the court doesn't have any further questions, I would simply rely on the remaining arguments in our brief. Thank you. Thank you. I would like to begin by addressing the substantial and injurious test and how the Tenard error infects the court's analysis on the Ring error. If you look at this court's precedents in Lambright and Robinson, the court addressed this very issue in the context of an ineffective assistance of counsel claim. And what both of those courts said was that it was a violation of Lockett to give non-causally connected mitigation de minimis weight or to underweight it due to this unconstitutional test. I submit that this is the exact same problem that happened here in the context of the Ring error. Well, the court, with respect to Tenard error, didn't say you had to show causal connection. It just said we give less weight. Isn't that all they said? What the Supreme Court has said, yes, they did use the term weight, but I don't think that absolves it from Tenard problems. In the Supreme Court case relied on by respondents, Harris v. Alabama, what the Supreme Court was saying that we reject the idea of laying down rules for the weighing process. Well, in Arizona, you have these rules that you cannot give effect to mitigation if it's not connected to the crime. So I think the analysis that gets overlooked in the Tenard error is whether you can give effect to the mitigation. In the Texas cases, the jury was instructed, you shall consider all this evidence. The Supreme Court said that's not good enough. You have to be able to give effect to it. And what does give effect to mean? It means it can support a life sentence. Well, give effect, you don't have to give everything equal weight. Isn't that true? Right. What the Supreme Court is basically saying, the only test that can exist for mitigation is the test that exists in the mind of that individual sentencer. It should be a subjective process that allows for different weighing. But what you have here is the Arizona Supreme Court creating a blanket category and saying Defendant A with Mental Illness A has to be treated the same as Defendant B with Mental Illness B. If there's no causal connection, we're going to treat those two mental illnesses the same, regardless of severity or the impact on the client's daily life. So this causal nexus test, whether or not you want to use semantics in evaluating use of the term weight, the real effect is whether or not it can support a life sentence. And the Arizona Supreme Court was saying in this case that it could not give effect to it, that no jury, no rational juror would give effect to this evidence. And I think that's the distinguishing feature in these Ninth Circuit cases examining this issue. It seems to be whether or not the causal nexus language actually appeared somewhere in the body of the opinion. In other words, in Shadd, you said you're not going to assume a Tenard error occurred. Well, in this case you don't have to assume it. We know it because they use the language precisely. In terms of harmless versus structural error, I think Nader is easily distinguishable. In Nader, the jury decided the facts of the case. They were simply given the wrong jury instruction, and so the jury failed to make a finding on a single uncontested element of the crime. There you had a jury from which you can conduct harmless error analysis from. Here there is no jury verdict, and it was a question of Murdaugh's mental state at the time of the crime. That's not a simple fact upon which there can be no debate. And if you look... Well, you're not arguing about his mental state at the time of the crime, are you? Well, I guess you are on this point, but it really is... It's not limited to the time of the crime. It's a factor, whatever the mental state is, at any point, just as post-conduct in prison is a factor. Right, and the fact that he cooperated afterwards, the fact that he pled guilty, those are all facts that can be taken into account that have nothing to do necessarily with the crime. Well, including his mental state at any point is relevant. And I think that gets to the heart of the matter here. No matter whether or not you think it affected him at the time of the crime or whether it fits G1, the fact of the matter is nobody is saying this man was malingering, that these delusions were not real to him. They were real to him. And when you have a mentally ill defendant, that's the classic case for a life sentence. Also, in terms of talking about structural error versus harmless error, United States versus Gonzales-Lopez says it depends on how difficult it is to assess the error in terms of deciding that issue. Whether to sentence someone to death based upon the circumstances of the crime and the circumstances of their life is not a question that's easily answered by harmless error analysis. The circumstances that govern that decision are unique to each individual sentencer. And I see that my time is about to run out. Are there any remaining questions? Thank you, counsel. The case to start will be submitted. Court will stand in recess for the day.
judges: Nelson, Reinhardt, Smith